## HEIRS OF DUPUY v. DUPONT and WIFE.

A simulated sale made by a father to a daughter and her husband, which is really a donation in disguise to the daughter, is without any more effect than if made to the daughter alone.

The rule that simulated contracts of a father when attacked by his forced heirs are only to be set aside in so far as they impair the *légitime* of the heirs, does not seem to apply to the case of a simulated sale of land or slaves to a favorite child. Code 2419, 1305-6-7-8-9-10, 1326, 1488.

The action *en declaration de simulation* may be instituted by the parties to the act, and their heirs and legal representatives, as well as by third persons, with this distinction, however, that the latter are allowed to have recourse to parol evidence to contradict the authentic act, whilst the former are precluded from the exercise of this right. (VOORHIES, J., with whom concurred BUCHANAN, J., dissenting.)

Heirs, except when suing to recover their *légitime*, stand in the same situation and enjoy the same and no other rights than those which were held by their ancestor. But when they sue for the recovery of their *légitime*, they are considered as third persons, or creditors. This difference is the result of the recognized distinction between the general rights of heirs and their rights to the *légitime*, the one being derived from the ancestor, and the other from the law. (VOORHIES, J., with whom concurred BUCHANAN, J., dissenting.)

The presumption of simulation established by Article 2456 of the Code is inoperative with respect to the parties to the act, and therefore to the heirs, in a case where the heirs derive their rights from the ancestor, a party to the act. (VOORHIES, J., with whom concurred BUCHANAN, J., dissenting.)

An *indirect* donation is based upon a real contract, and is an advantage conferred upon the other contracting party under color of a real contract for the whole, whilst a *disguised* donation, whether it assumes the form of a direct sale to the party to be benefited, or of a sale to an interposed person, is wholly a simulation. The *indirect* donation is, therefore, a real contract, with the exception of the advantage indirectly conferred; but the *disguised* donation is a simulated contract. (VOORHIES, J., with whom concurred BUCHANAN, J., dissenting.)

The indirect, or disguised donation, clothed with the form of a sale, if made to a stranger, would be good as a donation, if there were no prejudice to the *légitime*, but should the *légitime* be impaired, it would be subject to reduction. When such an advantage is conferred upon a co-heir, it is not only subject to reduction, but, in the cases pointed out by law, may be liable to collation. Where, however, such advantages are conferred upon incapable persons by a disguised donation, they are absolutely null, while, by an indirect donation, they are simply reducible. (VOORHIES, J., with whom concurred BUCHANAN, J., dissenting.)

The allegation in plaintiff's petition, that the husband is an interposed person for the benefit of his wife, does not deserve serious consideration, because the act of sale was passed to both husband and wife. (VOORHIES, J., with whom concurred BUCHANAN, J., dissenting )

At the date of the sale to the death of the vendor the parties lived in the same house, from which it must be inferred that delivery accompanied the act of sale, for it is well settled, that where a vendor and vendee live in the same house, possession follows title. (VOORHIES, J., with whom concurred BUCHANAN, J., dissenting,)

The relationship between the parties does not of itself constitute a badge of fraud or simulation. (VOORHIES, J., with whom concurred BUCHANAN, J , dissenting.)

Code 20, 1376, 1747, 2417, 2454, 2455, 2456, 1275, 1305, 1329, 1334, 1335.

APPEAL from the District Court, Fourth District, *Duffel*, J.

*Berault*, for plaintiffs. *Roselius* and *Filleul*, for defendants and appellants.

SPOFFORD, J. This suit appears to have been properly brought by virtue of an express provision of the Civil Code.

"The sales of immovable property or slaves, made by parents to their children, may be attacked by the forced heirs, as containing a donation in disguise, if the latter can prove that no price has been paid, or that the price was below one-fourth of the real value of the immovables or slaves sold, at the time of the sale." C. C. 2419.

The views we may happen to entertain of the policy of laws cannot control, or in any way affect the legal rights of parties which may be submitted to us for adjudication ; we are not permitted to distinguish between odious laws and laws entitled to favor. C. C. 20.

The District Judge, after hearing the witnesses, came to the conclusion that the sale in question contained a donation in disguise, and that no price was paid by the vendees; and he has given his reasons for judgment in a learned and elaborate opinion.

After a careful scrutiny of the evidence, a majority of this court are unable to dissent from his conclusions.

The plaintiffs are forced heirs of the deceased vendor, *Antoine Dupuy*, being his children by his first marriage.

The defendants, his vendees, are his daughter by a second marriage, and her husband, *Dupont*.

The sale was made to the defendants jointly, and produces in substance the same effect as if made to the wife alone, for in that case the property would have vested in the community if it passed at all. The petition expressly put at issue the verity of the sale; but the vendees have made no attempt to prove that a price was paid, except by showing that *Dupont* was an industrious man, and had money.

On the other hand, the negative is supported by strong circumstantial evidence, the only evidence of which the nature of the case seems to admit.

The sale purports to have been made about six years before the death of *Dupuy*. It comprised half his land and all his slaves. But no change of possession followed the deed. The defendants exercised no act of ownership until *Dupuy* died. For nearly six years, and up to the moment of his death, the pretended vendor, although his vendees lived in his house, continued to control the property exclusively, as owner, cultivating the soil and working the slaves, calling them his land and his slaves, and giving them in to the Parish Assessor as his own.

On one occasion, long after the pretended sale, he made oath before the As-

sessor that the land and slaves in question were his, in the presence of *Dupont*, one of his vendees, and without contradiction from him.

Under these circumstances, it is difficult to suppose that the parties regarded the sale as a reality.

The only reasonable hypothesis is, that it was resorted to as a device, to take effect only after the death of the vendor, by shifting the regular course of descent in favor of his child by the last marriage.

That no price was paid, may be inferred not only from the circumstance that the parties never, during the partnership, treated the sale as a contract having a real existence, but from the facts that *Dupuy* never acquired any other property after the sale, and that no money was found in his succession at his death. He continued actively engaged in planting after the sale as before, and nothing is suggested to render it probable that he spent more than he made.

*Dupont* had some money, it is true, but he bought slaves from other persons, paid for them, and took possession.

We find in the record no legal evidence that he paid a dollar to *Dupuy*, and sufficient presumptive evidence that he did not.

With the District Judge we think he should derive no benefit from his own extra-judicial statements, made after the controversy arose.

The rule that simulated contracts of a father, when attacked by his forced heirs are only to be set aside in so far as they impair the *légitime* of the heirs, does not seem to apply to the case of a simulated sale of land or slaves to a favorite child.   C. C. 2419, 1305-6-7-8-9-10, 1326, 1488.

The District Judge decreed that the sale should be set aside, and the property declared to belong to the succession of *Antoine Dupuy*.   It would have been more formal to have declared the sale a disguised donation to the daughter, and decreed that she should collate the property in a partition to be made hereafter among the heirs of *Dupuy*.   "The advantage which a father bestows upon his son, though in any other manner than by donation or legacy, is likewise subject to collation.   Thus, where a father has sold a thing to his son at a very low price, or has paid for him the price of some purchase, or has spent money to improve his son's estate, all that is subject to collation."   C. C. 1326.

As there is enough in the record to show that the decree, as rendered by the District Judge, will produce substantially the same result as a more formal judgment it need not be disturbed.

Judgment affirmed, with costs.

VOORHIES, J., (with whom concurred BUCHANAN, J.,) dissenting.   The plaintiffs, who are the forced heirs of *Antoine Dupuy*, deceased, demand the nullity of an act of sale from their ancestor to *Jacques N. Dupont* and his wife, *Irma Dupuy*, their co-heir, on the ground, as alleged in their petition, "that the said sale was simulated and merely intended to favor, contrary to law, the said *Irma Dupuy*, to the detriment of your petitioners, the said sale being fraudulent, as never having been accompanied by possession, or even assessed in the name of the said *Dupont* and wife, he, the said *Dupont*, being interposed for the benefit of his wife."

By giving to the above allegations the utmost latitude of construction, it will appear that the plaintiffs base their action on the following grounds :

1st. That the act of sale, being a simulation, is an absolute nullity, the estate of *Antoine Dupuy* deceased being still the real owner of the property in controversy.

2d. That the sale is a disguised, or an indirect donation to their co-heir, *Irma Dupuy*, through the interposition of her husband, to their detriment as co-heirs, and in violation of their rights to the *légitime*.

Their action has a three-fold character, being, firstly, an action "*en declaration de simulation;*" secondly, an action to set aside a disguised, or indirect donation in violation of their *légitime;* and thirdly, an action to set aside a sale, containing an advantage or extra portion in favor of *Irma Dupuy*.

I. The action *en declaration de simulation* may be instituted by the parties to the act, and their heirs and legal representatives, as well as by third persons, with this distinction, however, that the latter are allowed to have recourse to parol evidence to contradict the authentic act, whilst the former are precluded from the exercise of this right. Heirs, except when suing to recover their *légitime*, stand in the same situation, and enjoy the same and no other rights than those which are held by their ancestor. But when they sue for the recovery of their *légitime*, they are considered as third persons or creditors. This difference is the result of the recognized distinction in our jurisprudence between the general rights of heirs and their rights to the *légitime*, the one being derived from the ancestor and the other from the law. In the case of *Rachel* v. *Rachel*, 4th Ann., 501, the court said: "The action of forced heirs, in which the sale from a parent to his children is attacked as a disguised donation, is not derived from the *ancestor*, but from the *law*. So far as their *légitime* is concerned, they are not heirs but creditors." Hence, in the action "*en declaration de simulation*," independently of their rights to the *légitime*, the rights of heirs must be regulated by the rules which would have applied to a similar action on the part of the ancestor. The act of sale from *Antoine Dupuy*, deceased, to the defendants stands unimpeached by any counter-letter, and the plaintiffs have not thought proper to probe the conscience of the defendants; but they urge that the sale, never having been accompanied by possession or delivery, is presumed by law to be simulated. C. C. 2456. The presumption of simulation established by this Article of the Code, is inoperative with respect to the parties to the act, for the Article provides: "In all cases where the thing sold remains in the possession of the seller, because he has reserved to himself the usufruct, or retains possession by a precarious title, there is reason to presume that the sale is simulated, and, *with respect to third persons*, the parties must produce proof that they are acting in good faith, and establish the reality of the sale." Inasmuch, therefore, as the plaintiffs claim as heirs from their ancestors in this branch of the case, so far they cannot be viewed as third persons, and benefit by this presumption of law so as to throw the burden of proof on the vendees. The balance of the evidence being parol is unavailable to the plaintiffs to establish the alleged simulation, in so far as their legal rights as forced heirs are not concerned.

II. The second ground of nullity is, that the sale covers a disguised or indirect donation to *Irma Dupuy*, through the interposition of her husband, to the detriment of the plaintiff's *légitime*. It is important not to lose sight of the distinction which exists between a *disguised* donation and an *indirect* donation. The latter is one which is based upon a real contract, and is an advantage conferred upon the other contracting party, under color of a real contract for the whole; whilst a disguised donation, whether it assumes the form of a direct sale to the party to be benefited, or of a sale to an interposed person, is wholly a simulation. The indirect donation is, therefore, a real contract, with the ex-

DUPUY
v.
DUPONT.

ception of the advantage indirectly conferred; but the disguised donation is a simulated contract. 6 An. 673. Let us consider what would be the effect of an indirect or disguised donation to a stranger. Should such an advantage be extended to any person but a co-heir, without prejudice to the *légitime*, the act, though clothed with the form of a sale, would, however, be valid as a donation. But should the *légitime* be impaired by such a disposition of his property by the ancestor, then the donation, whether disguised or indirect, would be subject to reduction. Whenever such an advantage is conferred upon a co-heir, besides the right of reduction, the other co-heirs are entitled, in the cases pointed out by law, to demand its collation, but this will be considered in its place. There being no law prohibiting a parent from donating property to one of his children, or even a stranger, apart from the *légitime*, it follows that a disguised, or indirect donation in such cases cannot be considered as void, but merely reducible according to circumstances. However, in cases where such advantages are made to incapable persons, another distinction prevails: the disguised donation is affected with absolute nullity, and the indirect donation is simply reducible. In the case of *Thibodaux*, 6 An. 673, the court observed that Art. 1747 of the Civil Code contains two separate dispositions: one by which the spouses are incapacitated from giving to each other more than the law permits, in which case the excessive donation is reducible: and the other declaring null and void all donations disguised or made to persons interposed. This distinction of reducible donations between husband and wife, and donations which are null and void on the ground of interposition or disguise, came to us from the Roman law. See Digest, book 24, title 1, law 5, paragraph 5; Pothier, Donations entre Mari et Femme, No. 78.

It was recognized by the late Supreme Court in the case of *Casanova's heirs* v. *Acosta et al.*, 1 L. R. 185. It was also recognized by the French Commentators under a similar disposition of the Code of France. 5 Toullier, Nos. 76, 83, 901, 902.

The allegation in the plaintiff's petition that *Dupont* is an interposed person for the benefit of his wife, does not deserve serious consideration, because the act of sale was passed to both the husband and wife. On the hypothesis that the sale is a disguised donation to the prejudice of the plaintiffs' *légitime*, it appears to me that the proper remedy would be for them to sue for a reduction, instead of the nullity of the sale, in the absence of any legal objection to the vendor's right to make a donation to the defendants. But has it been shown that the act of sale was a simulation, covering a disguised or indirect donation to the defendants in violation of the plaintiffs' rights as forced heirs?

On the 9th December, 1844, *Antoine Dupuy* conveyed to the defendants, by authentic act, a small tract of land of three-fourths of an arpent in front by forty in depth, with the double concession, described to be bounded above by the land which he then owned and occupied, and also a negro woman and her five children, for the price of $2000 cash. There were no improvements on this land, on which *Dupont* has, since the death of *Dupuy*, constructed fences and a levee. The vendor died in 1850. Thus the land in dispute and the lands owned and occupied by *Antoine Dupuy*, originally formed but one tract, which was assessed in the name of the latter, and, it appears, continued to be so assessed until the year 1851, and in 1845 it was assessed at $1500. The slaves were also assessed in the name of *Antoine Dupuy*. From 1845 to 1850 there was only one slave, and in 1850 three slaves, assessed in the name of *Dupont*, .

and in 1851 the land and eleven slaves were assessed in his name, the land at $2000 and the slaves at $6500. One of the plaintiffs' witnesses testifies that Antoine Dupuy, in 1846, gave in, under oath, the land and slaves in question to be assessed as his property, in the presence and within the hearing of Dupont. Another witness testifies that Antoine Dupuy, in speaking of the property, always said my land, my negroes, and whenever Dupont loaned anything from the plantation it made the old man angry, and Dupont knew it. Here it is proper to notice that none of the implements of husbandry, or things attached to the land on which the parties resided, constituted any part of the property conveyed to the defendants. One of the witnesses testifies that the land in question was worth from $2000 to $2500; another witness, that it was worth $3000, and both concur in their testimony that the slaves were worth $1500. It is admitted that the land on which Antoine Dupuy resided constituted the only property which he owned at the time of his death.

On the other hand, it is shown that Dupont was an industrious mechanic, and remarkably economical. In October, 1843, it appears he had in deposit upwards of $2000, wages which he had earned. He was married about this time, and lived with his wife in the same house with his father-in-law, until the period of the latter's death. One of the plaintiffs' witnesses also testifies that Dupont, in conversation with him, expressed the pain he felt on account of the bad terms on which he was with the heirs of Antoine Dupuy in relation to his purchase of the property in dispute, on account of which, Dupont said, he had only paid $1400, leaving a balance of $600 still due by him; and that if the heirs would reimburse him the amount he had thus paid, as he thought an injustice had been done to them, he would be willing to annul the sale.

This constitutes the substance of the evidence on which the plaintiffs rest their claim for redress against an act which they allege to be in fraud of their rights as forced heirs. In this respect they have been allowed the benefit of resorting to parol evidence for the purpose of impugning a solemn act of sale from their father. In this they have not succeeded. However, before dismissing this subject, it is proper to notice more specially the evidence in relation to the question of simulation. At the date of the act of sale, and up to the time of the death of Antoine Dupuy, the parties lived together in the same house. From this it must be inferred that the tradition or delivery of the property accompanied the act of sale, (C. C., Art. 2454, 2455,) for it is well settled that where the vendor and vendee live in the same house, possession follows title. 3 N. S. 337; 19 L. R. 349; 1 R. R. 41; 11 ibid, 533. The fact of the relationship between the parties does not of itself constitute a badge of fraud or simulation, (9 M. R. 649; 1 N. S. 335; 19 L. R. 600; 6 N. S, 643,) nor does the fact that the property continued to be assessed in the vendor's name, and the other circumstances of the case, afford sufficient ground to establish the alleged simulation.

III. The third objection which the plaintiffs raise to the validity of the act of sale is, that it contains an advantage or extra-portion in favor of Irma Dupuy, or, in other words, such a donation as she is bound in law to collate. It is hardly necessary to state that collation is due only by heirs to their co-heirs, and not by strangers. The sale, so far as Dupont, the husband, is concerned, could not in any event be subject to the provisions of the Code regulating the mode of making collation; and, as regards the vendee, Irma Dupuy, who is the plaintiffs' co-heir, the form of the present action is radically defective. Collation is an incident of the action of partition, and the party who

DUPUY
v.
DUPONT.

is subject to this demand has certain rights to exercise in complying with it, such as to make the collation in kind or by taking less, etc. See C. C., Art. 1275, 1305, 1329, 1334, 1335.

I am, therefore, of opinion that the judgment of the District Court, ought to be reversed, and rendered in favor of the defendants, reserving, however, the plaintiffs's right to any claim for collation which they may have against the said *Irma Dupuy*.

A rehearing was applied for, when the following order was made:

Spofford, J. Ordered that a rehearing be granted only as to the propriety of amending the decree so as to order the collation of the property in controversy, a majority of the court being of opinion that the rehearing should be restricted to that question.

Upon a rehearing:

Spofford, J. It is ordered that the decree heretofore rendered in this cause remain undisturbed.